Good morning, Your Honors. Marta Van Landingham for Appellant Donna K. Lee. In Bennett v. Mueller, this Court set out a very clear three-step burden-shifting process by which federal courts were to determine whether a state procedural bar was adequate and independent to block federal review of claims. In Step 1, the state would assert the affirmative defense. In Step 2, the petitioner would challenge the adequacy and independence of the bar with specific factual allegations and citation to authorities. At that point, which is a point, by the way, which was met in this case, in the first go-around, this Court remanded the case, finding that petitioner that's, I'm sorry, that appellant had challenged the bar, and remanding to allow the state to meet its burden at Step 3. And the Step 3 burden is the ultimate burden of proof of the adequacy and independence of the bar. The policy underlying Bennett is that the state has the records and access to the authorities in order to meet this burden of proof. And it would seem fairly easy, if a bar were in fact adequate, if it were consistently and regularly applied, for the state to prove that. It could gather petitions from the relevant time. It could find the claims which should be barrable under Dixon, in other words, record-based claims that had not been presented on direct appeal. And it should show that in the majority of cases, the California Supreme Court had applied the Dixon bar in those cases. Kagan. So your suggestion, if I understand it correctly, is that the government or the state should then take a period of time, delve into the underlying record for all habeas petitions in the California Supreme Court for that time period, and figure out whether the Dixon bar applies. Correct. And then from there, calculate the percentage of cases in which it was actually applied versus the universe of cases in which it could have been but really wasn't applied. I'm not sure if there's an actual percentage that's necessary, but just to make a showing, applying a lot of the language as part of the doctrine of procedural default, that it is applied regularly and consistently in the vast majority of cases. However, from my understanding is not only did they not do that here, I am not aware of a case in which the State has ever met the third-step burden with regard to Dixon. There are a number of cases in which the courts below have ruled against the Petitioner and barred a case under Dixon, but in all of those cases, at least to my knowledge and I've done quite a bit of research into this, in all of those cases it was because the State did not adequately challenge the bar. Often that is because Petitioner is incarcerated and lacks the legal acuity and the access to resources to even know what procedural default doctrine might be. But when it comes to making the showing of regularly and consistently applied, the State has not done so. What it attempted to do here was a two-pronged approach. First of all, it took the minutes from California Supreme Court cases for about 22 months surrounding the time of the alleged default here, and it counted them but without reference to the underlying claims, without linking the findings of the California Supreme Court to what the claims actually consisted of. So the Dixon citations are unmoored from the substance of the claims, and therefore, as I have argued, they're rather meaningless. I mean, for all we know from those minutes, the California Supreme Court was applying them completely randomly. I mean, I'm not saying that they were, but I'm saying that it hasn't been proven otherwise. The other way that the State tried to assert the adequacy and independence of the Dixon bar here was by misinterpreting the U.S. Supreme Court's findings in Walker v. Martin. That case was very specifically about California's timeliness bar and how it can be adequate as discretionary. And that case very clearly stated in its text a number of times that it applied only to California's timeliness bar. But the State here is asserting that in actuality, Walker v. Martin completely abrogated silently the entire doctrine of procedural default and renders all procedural faults, apparently in all States, in all cases, presumably adequate. And also the implication there is that from now on, the burden falls on Petitioner to prove inadequacy. Of this presumably adequate all, you know, procedural bars. And I don't think that there's anything about the Walker v. Martin decision that supports that approach to procedural default. Kagan. Let me ask you about the government's evidentiary burden at Bennett, Step 3. Why isn't it enough for the State to come forward and say, well, we've demonstrated that this is a well-established procedural bar. It's been around for 50, 60 years now and regularly cited in California's jurisprudence. We are now going to come forward and challenge the evidence that's produced by the Petitioner at Step 2, which they did in this case. They evaluated the evidence that the Petitioner came up with in regard to the denials of one particular date, December 1999, and demonstrated or did a thorough analysis of why it was or was not properly applied in each of those instances and kind of ended there. Did they need to, in other words, go one step further and do what they did in this case, which was to deny the 1,500 petitions that were denied in the California Supreme Court? Well, the Petitioner's showing of those cases from December 21, 1999, was in order to meet Step 2, and this Court did find that that was sufficient to meet Step 2. The same evidence was found sufficient to meet Step 2 in Monarez and in several other cases. My question really, and I don't see that the case law really clearly speaks to that point, is what it takes for them to meet Step 3. So is their evidentiary burden at Step 3 constrained or limited by what was brought forward at Step 2? So yes, I understand your point that that is addressing the evidence in Step 2, but it is also a way to answer their burden at Step 3 as well as to say, well, you've presented this particular evidence at Step 2. The Court has basically said you've met your burden. Now it shifts to the State to demonstrate our burden at Step 3. And as part of that burden, we're going to show that this is a rule that's well established in California. It's a rule that's regularly cited in California case law. Anyone practicing in California should really be on notice of it by now. And we'll go one step further, because we have the burden at Step 3, to demonstrate that the instances that you relied on at Step 2 really aren't borne out when you delve into the record of those instances. Why isn't that enough to meet their burden at Step 3? There are two parts to that answer. I hope I don't forget one or the other. First of all, with regard to the establishment, the age of the Dixon rule, it was promulgated in 1953. And in 1993, so 40 years later, the California Supreme Court basically admitted that it was not being applied regularly and consistently and tried to clean that up in N. Ray Harris. And in 1998, so five years after that, so after Dixon had been in place for 45 years, once again, the California Supreme Court basically acknowledged the fact that the Dixon rule was all over the place in N. Ray Robbins, and once again, as this Court found in Park, tried to make it adequate. So, therefore, I think that shows the State court's own clear acknowledgment that the age does not necessarily mean that it's well established, that even though it's been around forever, the courts were not applying it regularly and consistently. Now, number two, with regard to the States. Sotomayor Well, they are applying it regularly. Kagan Right. Correct. But that does not mean that they're applying it where it's merited. And that's what needs to be shown in Step 3. I mean, one of the issues underlying the doctrine of procedural default is to ensure that the States aren't using the bars in order to get rid of disfavored claims, to block them from federal review. And that is why, then, it requires the Step 3 ultimate proof analysis. Now, with regard to your question about the States' attack on petitioners showing it at Step 2, I believe the State was mistaken in its analysis. Having looked at all these California Supreme Court minutes with 4,600 whatever cases, you get a real clear view of the State's pattern of application of denials, of how they deny things. And most of the time, they would throw out either a silent denial, which per Richter is on the merits, or a merits analysis. But most often, they would throw out mixed reasons, bases for the denials, including different procedural bars and or the merits all at once. Now, because sometimes the bars were mutually exclusive, Waltrius and Dixon, for example, are directly contradictory, and often they would be both applied for the same petition, that goes to show that the California Supreme Court would look at the, you know, different claims, depending on their procedural history below, or applies perhaps merits denials to other claims. So if that's the case, when Ms. Lee below showed that there were a number of California Supreme Court cases on this day that included claims that were barable clearly under Dixon, but that the Dixon court did not apply that bar, that's why that was taken as proof of the inadequacy, of the failure to apply that bar regularly and consistently where merited. Now, this case itself has a lot of indications internally of the inadequacy of the Dixon bar. Ms. Lee, who was pro per for most of the history of this case, filed a number of petitions at different stages in different courts. And when it was pointed out to her that a lot of her claims were unexhausted at the Federal Court, she returned to State Court, and first she filed a petition at the Superior Court. And that court applied a number of different procedural bars to her claims, including Dixon and timeliness. She then went to the California Appellate Court and filed the same claims. And that court applied a number of procedural defaults, including timeliness, but not Dixon. So therefore, that court did not find any, you know, claims that were based on the record but not in the direct appeal. But then when it got to the Superior Court, the California Supreme Court, then once again it applied different bars, including Dixon, but not timeliness, which the two lower courts had found. I don't know where the – I don't think that means very much. I would think that it would be understandable for a court to look at the date that it was filed and say this is – this is untimely and never get to the – get to the second point. I mean, I don't think that you can interpret the court of appeal ruling as meaning that they rejected the Dixon defense, which is what you seem to be saying. It's just that you can't go from being untimely to then being timely by the – by the later date when it was presented at the California Supreme Court. Kennedy, who processes these? Excuse me? Who processes these in the State court? I do not know, Your Honor. That is very mysterious, that process. Yeah. And do you know how many – would you know offhand the number of State habeas petitions that are granted by State courts? I don't know the number. I know that there are articles looking at the State process that have deemed it broken that say that not very many at all. I know that we seldom get orders to show cause. We seldom get evidentiary hearings at the State level. For the most part, most cases are denied silently or on a mixture of procedural defaults and or merits. And you get – you get those postcard denials? Correct. Those are the silent denials, which, according to Richter, are on the merits. I'd like to reserve what time I have left for rebuttal. Okay. Thank you. You're the habeas expert for the State. It's a heavy responsibility, Your Honor. I don't know. Good morning. Bob Snyder, Deputy Attorney General for former Warden Jakes. May it please the Court, I think I want to throw out most of my script and talk directly about adequacy, because that does seem to be the Court's concern. What does it mean for a procedural – You can hand the script up here, and I'll read it. What does it mean under our jurisprudence for a procedural bar to be adequate? Well, it has to be clear, it has to be firmly established, it has to be regularly applied. That's the thread of many of our Ninth Circuit and Supreme Court cases. This bar is not novel. It's not difficult to define. The rule itself is susceptible to only one interpretation. And there's no reason for confusion or uncertainty, at least, about the rule. It's also firmly established. It existed since 1953. Granted, the Supreme Court took another look at it in 1998 and reestablished the bar, but it's never been applied retroactively. So that leads us to the question of adequacy. When is the bar actually adequate? Is it regularly and consistently applied? The way that's often been defined by this circuit has been in the negative. What makes it not regularly applied? We said in Wood v. Hall that if the bar is not applied infrequently or unexpectedly or frequently, then it's regularly applied. We said in Duggar v. Adams – actually, the Supreme Court said in Duggar v. If it's applied even-handedly in the vast majority of cases. And it's not unsettled due to ambiguous or changing state authority. So the question becomes, was Respondent showing enough under the circumstances given what Petitioner did with respect to the second step, what Respondent did with respect to the third step? This part of it is kind of novel because although Bennet v. taken a published look at what it means to meet Step 2. Step 1 is easy. The Respondent simply asserts it. But what does it mean to meet Step 2? Petitioner came in and said, well, we're going to look at nine cases from December 1999. I have two thoughts about that. Number one, it's after the date of default by six months. And so all of our cases in the Ninth Circuit say we examine the adequacy at the time of the default, six months earlier. The second point is, nine cases were looked at. But according to science research, in that month, on that day, December 21, 1999, 203 denials occurred. Granted, 22 of them were Dixon. That's in one day? Yes. Well, it's reported on one day, Your Honor. The process takes place over the course of a month. Well, we're talking about Step 3 at this point, which is the State's burden, aren't we? Because a prior panel had remanded the case, and it appears to have addressed already Steps 1 and 2. So I'm inclined to think that we're past that now. The remand is for the State to submit or create an evidentiary record that Dixon is an adequate State procedural bar. So in terms of whether the State has met Bennett's Step 3, why don't you talk about that?  Thank you, Your Honor. I think it's relatively undisputed that regularity has been shown, at least in the 20-month surrounding Petitioner's default. Consistently, the average was about 12.5 percent Dixon denials. And, of course, the remaining question is, well, in how many cases could the Dixon denial have been imposed, and yet it wasn't? And I acknowledge that that's an issue for the Court. But there is something more to be said, which is this. There were many other procedural denials not related to Dixon during those periods, roughly two to three times as many non-Dixon procedural denials, if you will, as there were Dixon denials. And so we can take out that from other cases. The more procedural denials we have, the better, because then we never have to get to the merits. Well, that that It was important, not getting to the merits. Well, you know, it is important to the Petitioner that the Federal constitutional claims be heard. I, I, I Yeah, but we're not going to, but it's important to not get to the merits. So we set up these hurdles. I understand that. And then we sent all the work to the Federal courts. Well, there's always that tension between the State's procedures to assure regularity and the Federal courts' interests in hearing the claims. Well, no, there's no interest in it. The, the Federal courts welcome all that business. We get probably in downtown L.A., they probably get three or four thousand every year. And so we have to employ, we employ a platoon of magistrates and law clerks and more court clerks as full employment. And it adds to the national product, you know. Yes. And it's brought us out of the recession. You understand that? Yes. I think in the State and Federal systems, we experience that. Well, let me, let me ask you this, because I think you point to the hole in the statistical evidence that the State has brought forth. You've shown us that there were 4,700 petitions denied during a particular time period, and of the 4,700 denied petitions, 12 percent invoked the Dixie Act. And you say, well, we should have applied for Nixon Bar, but what you don't say is how many other cases in which Nixon Bar should have been applied but weren't applied. And without that little hole, what is the statistical significance of the 12 percent? Isn't it just a number in a vacuum? Well, it, it shows regularity. I, I think it's more than what Petitioner called a numbers game, but I, but I appreciate the Court's concern. And, you know, while, while those records were not available in Los Angeles, they may well be available in San Francisco. And so, to the extent the issue's important, you know, does the, is the Dixon Bar regularly applied or is it not, perhaps that, that would be a solution to the case, to, to actually require that analysis. Perhaps the district court could do that. Why, why, why is it that we rarely, rarely get a, a habeas petition where the proceedings originated in the federal courts? Hardly ever see them, you know. As opposed to the state court? Oh, yeah. With state court, we're inundated with, we're inundated. With federal courts, we hardly ever see them. Why, why is that? You know, in, in Canada, I, I don't do enough federal work to, to know the answer to that, Your Honor. Well, you know, there's, there's one reason. That's because in the federal court, if you're, you know, a district judge and you're assigned a case, whether it's civil or criminal, that case stays with you as long as you're alive and active on the court. Right. See? But if you're in a state court, that case does not stay with you. It stays with the department. Huh? Yes. So there's no fixed individual responsibility. So if you mess up, what the hell? You know, the next guy that's going to be in that department, January 1, maybe they'll have to worry about it. See? That's what the, that's what the problem is. Right. I, I, I, I would note that for the case to be viable on federal habeas. You know, you know, we get thousands and thousands of them. And you know how many are granted a year? I don't. You know how many are granted a year? I, I don't. Probably. I'm just guessing. But down in the district court, say they get 3,000, I'll bet there aren't 10 that are granted. And then the attorney general up in Sacramento, like Evel Younger, used to go mad how the federal courts are interfering with the state court system. You know? And I knew Evel well, but it was, it was a good way for him to get his name in the papers. So the states aren't doing their job. They're giving the work to the federal courts. And it's just a, it's why I call the great writ the great joke. You're a nice guy. You look like one of my brother-in-laws. I really do. Your Honor, I think there is a tension between the federal court's desire to reach constitutional claims and the state court's need to protect its interests in finality and fairness. And so when a rule which is pretty clear, like you can't bring claims that. I understand that. And perhaps you're right that the 12 percent number in and of itself may demonstrate some regularity depending on how you define regularity. My problem, what I'm struggling with is I can't tell whether it's consistently applied without knowing how many cases in which the Dixon Bar could have been applied but wasn't. So let's say if the California State Supreme Court applied the Dixon Bar in only 10 out of 20 cases per 100 cases in which they could have invoked the rule, then that's only a 50 percent application of the bar instead of 80 percent or something plus. I don't think any particular percentages are required, and it's not clear to me that whether we need to even require the vast majority of cases. But without knowing cases in which they bypassed the Dixon Bar and could have applied it, I can't tell whether it's consistently applied. And so in answer to my prior question, I guess what you're indicating is that those records, are they unavailable and the State could have done an analysis of those records? I think I can't say for sure, Your Honor, because at this point they're 15 years old and it's pre-electronic era. But I think it could be known. And, you know, I think the problem with this record is we don't really have compelling evidence that it's being inadequately applied. And the evidence that it is being regularly applied seems to be limited to frequency as opposed to the net of how many places it – how many times it could have been applied. And so one solution to that might be – might well be a remand to the district court for that determination, which could settle the question once and for all, a question that's never been answered in this Court. But short of that, were the Court not wishing to do that, I would have two thoughts. The first I mentioned before, which is there are many other procedural defaults that take it out of the Dixon issue. And second, here's where I think the relevance of Walker v. Martin comes in. Granted, that was a timeliness case. But what the Supreme Court said unanimously three years ago, Justice Ginsburg, is that a discretionary rule ought not to be disregarded automatically. Kagan. But this isn't a discretionary rule. That's the problem. The timeliness question in Walker is a discretionary rule. But here it seems to be a very clear rule that needs to be mechanically consistently applied. And I can't tell the answer to the consistency question. Verrilli,, Yes. I would say it's not rigid insofar as there are jurisdictional exceptions to the application of the rule. But, you know, to the extent it's different, the discretionary versus mandatory, it would seem to me that the mandatory rule is the stronger case for adequacy and independence. Because if a discretionary rule can be found to be consistent, then certainly a mandatory rule would fall into that category, too. I think that the last thing I'd want to talk about, if I may, Your Honor, is the, and it really addresses Judge Pragerson's point, yes, the Federal court is terribly burdened by these merits decisions. The State court is also burdened. And in Walker v. Martin, the Supreme Court pointed out that although it receives only about 2,200 habeas petitions per year, the California Supreme Court during the same period received 3,300, almost 50 percent more. So they're deluged. Justice Ginsburg called that load staggering. And so the procedural default is sought as one way to protect the fairness of all the petitions to the other Petitioners. Well, you know, the two systems are different. In the State court, oh, I was on the State court for a few years, but that's a long time ago. But when it comes to filing a criminal complaint, the Federal prosecutors are much more selective. You know, they don't come around and file a case unless they think they've got a good case. And there's a difference between the way cases are investigated in these two different jurisdictions and the way they're handled. And so there's a lot of factors there. And so if you want to talk about this sometime, I'll buy you a cup of coffee. Thank you, Your Honor. Thank you, Your Honor. In my 43 remaining seconds, I'd like to address the issue of relief. The State asks that this be remanded to give them yet another shot at Step 3. I would instead argue that that could be fairly fruitless at this point and instead ask that this Court find that there has been insufficient showing of the adequacy and therefore it does not bar relief on the merits and perhaps remand in order for the Court below to weigh the merits of the claims. And why would it be fruitless if they're indicating that they can give that missing number? I mean, we may not do it because we remanded it the last time around for the State to meet the burden, but I didn't understand your comment about the fruitlessness of it. This would be not only the third go-around in this particular case, but as I mentioned earlier, it has never been done. So add that into the analysis, and that's where I came up with it being fruitless. And I would also ask for this Court's clarification as to the role of Martin applying to the timeliness bar as an offshoot of the Beard analysis of discretionary bars and that it doesn't affect the analysis to be applied to mandatory bars. Well, one good thing that could be done to maybe ease the situation would be to have State public defenders work in the prisons. Yes, I agree. I think the situation in which these incredibly complicated issues are to be determined by pro per indigent in prison... Well, I don't think the law libraries are adequate. No, they're not. And the time limits are very strict, and so that's part of the problem, too. I very much agree. Anyway, it'll get solved in the next 200 years. Well, thank you very much, Your Honor. Thank you.
judges: Schroeder, Pregerson, Nguyen